And I realize, counsel, we're a little complicated here on the on this. So I hope you'll help us by reminding us who you represent. We certainly will, Your Honor. And to simplify this a little bit, I won't I won't be very long and we'll reserve some time for my colleagues. My name is Mark Louvier. I represent Dr. Terence McGee and Kim McGee. They were the defendants in the underlying action. An adverse verdict was, of course, entered against them. The defendant did not. Dr. McGee owed a legal duty to the plaintiffs in connection with a workplace drug test. Mr. or Dr. McGee, rather, was a third party there. The question of whether a duty exists is, of course, a question of law. The burden on proving the duty is on the plaintiffs. The plaintiffs have asserted two forms of duty. First, that there was an assumed duty under Washington law, and they point to the Rob versus City of Seattle case. And secondly, the Ninth Circuit common law. The Ninth Circuit common law, we suggest, does not exist with respect to the assumed duty. We don't believe that there is an assumed duty, and we think that the Rob case stands for the directly opposite position where we do not assume duties. We don't manufacture them in retrospect. The closest pronouncements we have on these principles coming from the state of Washington are from a series of cases in the late 90s and early 2000s, which culminates in the Judy versus Hanford case. And what Judy tells us is that there are narrow circumstances under which a physician who is brought in by an employer can be held liable. Critically to our analysis here But why does the fact that Dr. McGee is an M.D. as opposed to, let's say, a Ph.D. make a difference? I don't think it does. I don't think it does. So if he were just a chemist, qualified, certified to do what he did here, you would be making exactly the same argument? Not if he were a chemist. If, for instance, if he were still a health care provider, because Washington law adopts specific classifications for health care providers. But what does being a health care provider have to do? He wasn't a health care provider here. He wasn't acting in that role here. Sure. And that is conceded. There is no RCW 770 claim. It's not under the Medical Malpractice Act. But if you look at Judy v. Hanford, for instance, what Judy tells us is that when an individual with medical expertise comes in, they have a narrow potential field of duties that they might owe to someone downstream, like an employee like Mr. King. And what Hanford tells us In that case, were they were they acting in a medical capacity? No. And so but the plaintiff made both claims. They made an RCW 770 claim under the Medical Malpractice Act. And then as a as a fallback position, they asserted a general negligence claim. And what the Hanford v. Judy court said is that there might be liability to the employer under these circumstances, but we've never extended the duty far enough to reach to a third party who's involved in doing a preemployment physical. What Judy does say is that there are circumstances under which a third party could nevertheless be held liable. But those would be at a situation where the individual failed to diagnose some condition that was plainly apparent, for instance, in the the previous case, Eelboda. So the hospital might have a cause of action? No, no, no. The hospital might have a cause of action against Dr. McGee in this case? Is that what that case stands for? No, it does not say that. No. What I'm saying is the employee could have a direct cause of action against the employer. Now, I'm trying to figure out who might be able to sue Dr. McGee for his negligence. Potentially the hospital. Hanford doesn't say that, but certainly there could be causes of action available by the hospital for incorrectly performing the employment physical. It wasn't asserted in this case, but certainly it's a potential cause of action. Let me ask you a little bit different question. I read another Washington case that's affiliated FM Insurance versus LTK Consulting, which is a case about an engineer who undertook some contractual obligations, but before undertaking the contractual obligations was sued just under general tort duty, and that engineer was held to have a duty. Why is this any different than that? I'm not familiar with that specific case, but at the trial court level we did cite Berg versus Shannon and Wilson, which is essentially the same argument, which is there were uphill landowners and downhill landowners, and there was an assertion that a engineer, a geotechnical engineering firm that did an analysis of that upward land owed a duty to the downhill landowners, and the court decided that in the absence of privity, in the absence of a direct relationship, there was no duty. Well, but I guess in this particular case, what the Washington Supreme Court said was that engineers who undertake engineering services in this state are under a duty of reasonable care, and the duties relate to everything that the engineer might do, and the only question was what is the scope, and I guess they in fact said in that particular case the scope would include somebody like, in this case, the plaintiff. In engineering, of course, the one distinction I would draw without having read the case is that I understand the scope concern, because when you have an engineer, you're building something that's available and accessible to everyone, and so I'm sure there are... Well, but in this particular instance, that's the reason why in reading that case, I suggested to myself, well, this seems to say there is a duty here, and the scope is easy to make, because there's no question that your client was doing something that this particular, if you will, the plaintiff had every bit of a chance to rely on what that person was doing. But Mr. King in this instance was not a direct beneficiary of Dr. McGee's actions. He wasn't entitled to the reports. That was very easy to see by everybody. I mean, everybody knew exactly what was going on. Whatever McGee said was going to be the law with respect to King, and if McGee said King is clear, King was clear, and if he said King is guilty here, then King was guilty, and everybody knew that, including Dr. McGee. I would respectfully disagree, because I think that the employer still had the opportunity to do a fitness for duty examination. They could have taken King at his word. They could have given him a separate test as he requested. How could they take King at his word once Dr. McGee had done this and said, there's no way that the Tylenol-3 can explain the levels of morphine and codeine in his system? Then you take King at his word and say, when King requests a supplemental examination or says this test is absolutely wrong, I've been a good employee, then you perform another test or consult with another doctor. It's a hospital. They have doctors available, and doctors were deposed in this case. So even if Dr. McGee had gone back to his office and flipped a coin to decide whether or not the levels were too high, there's no relationship between them, and so he is not answerable to Mr. King? No, he's not. No, he's not in privity, and he doesn't owe a direct duty. Well, but privity is contractual. We're not talking about contractual here. Understood, but I think it's the same sort of situation we have out there. I don't think it's the same. That's the reason I put you with this case affiliated FM. This seems to talk about a duty which is outside of the contract, which has more to do with what is the general duty of someone who, based on the state having given him the authority to do what he has to do, what are his duties? And here, an engineer is in the same kind of position as this doctor, and they said it's a general duty to everyone, and all we're talking about then is what's the scope? And I didn't think there was any question about the scope here, because everybody knows. Everybody's well aware. This is the test that's going to make a difference, and this is the explanation that's going to count. I'm sort of backed into a corner on the scope issue, not being familiar with that case, and I'd rely on my earlier argument to suggest that engineers and individuals who perform medical examinations for employers have a different scope of individuals that they deal with, that they examine, and the employers that they report to. With that said, I'm well over my time at this point. Thank you for your questions. And thank you for addressing our concerns. Good morning. May it please the Court, I'm Carl Huber. I'm with the Spokane law firm of Winston and Cushe, and I represent OHS Health and Safety Services, who is a defendant at the trial court. OHS is a third-party administrator that is involved in this case with employment drug tests. And it's my understanding that OHS is the one who brought Dr. McGee to the party. That is correct. And Dr. McGee, as I understand your argument, is an independent contractor? Yes, and there was no evidence. But nonetheless, he was brought to the party by you, right? By OHS? Yes. They hired him as an independent contractor to read and evaluate. So we're talking then about a parent agency? Yes, Your Honor. So what part of a parent agency is not fulfilled here? Well, it's our position that in a negligence claim, there has to be evidence presented, one that the plaintiff relied on the existence of the agency to his detriment. And in this case, there is nothing in the record that Mr. King, the plaintiff, knew who OHS was, knew what they did. It looks like you've got some cases. It looks like you've got some support there. The sort of striking development is the shift between the second restatement and the third restatement, which it appears that reliance has been dropped from the third restatement. Are there any cases in Washington that are now relying on the third restatement? I'm not aware of any, Your Honor. And I guess the only comment I have towards the third restatement is that it's important to be mindful that this was a negligence-based case, and the vast majority of the apparent authority cases come up in either a transactional or a contractual context, and that you've got slightly different rules when you're dealing with a tort such as negligence. So really, your big argument is reliance, then? Yes, Your Honor. You're not really going that one must be caused to cause the one claiming apparent authority to actually or subjectively believe that they have the authority, nor are you really arguing that they must be such that the claimant actual subjective relief is objectionably reasonable? Well, Judge, we've made all of those arguments in our briefing, and to the extent we've done that, we are relying on that. However, if we're looking at the core issue here, I believe it is the reliance issue, and that's our primary argument. Thank you. All right. Thank you.  Clerk, Counsel, Jeff Galloway, I represent Dennis and Tricia King in this matter. At the onset, I'd like to reserve about three minutes of rebuttal so that I may respond to in support of my appeal against Garfield Hospital. So I'll be speaking for about twelve minutes today, depending on the Court's questions. I'd first like to address the issues raised by Dr. McGee regarding duty. Dr. McGee relied heavily on the Judy v. Hanford environmental case, and that case is very distinguishable from this case in that under this case, we have not brought our cause of action under RCW 770, which is a medical negligence cause of action. We've alleged that Dr. McGee had a common law duty, and that that common law duty is what he violated. So really you're suggesting there is no statutory duty here? Yes, Your Honor. Under 770, we agree that under 770 there may not be a statutory duty, and that is why we did not plead the claim that way. We brought it as a common law cause of action, common law duty. And really the cases that I think are most on point, when we look at an MRO, a medical review officer such as Dr. McGee, we've got precedent from the Ninth Circuit. We look at Ishikawa v. Delta Airlines where we had an MRO found a and then we've got the Quisenberry case. Oh, no. Is Ishikawa, is that a Washington case? It's a Ninth Circuit case. I don't care what California, I don't even care what Nevada thinks. Fair enough, Your Honor. Even if I live there, but that's, I would like to know whether it's a Washington case. It is not a Washington case. Okay, then why is the common law, does Washington accept the common law duties honored by the Ninth Circuit in other states? No, they don't, Your Honor. I was just making an example that there has been a duty found. What does Washington say about common law duties? Washington, when they talk about the common law duty, I would point, Your Honor, to the Parilla case. It's a Parilla v. King County and it turns on foreseeability. Is the harm foreseeable? And in this case, we had our expert, Dr. Paul Landsberger, testify that there was a duty and that it was foreseeable. And then we had Dr. McGee, through his own testimony, testify that it is foreseeable that based upon his interpretation of the urine drug screen as either positive or negative, an individual will either retain their position, gain employment, or be terminated. And so really, that's where the common law duty comes in, is foreseeability. Is it foreseeable that if you are negligent in interpreting a urine drug screen, that that will have consequences to the donor? Is there a different duty as it relates to a doctor in Washington than any other, given the capacity of what this doctor did? I mean, that's the only thing that worries me, because I found, I mean, I looked at Parilla. I looked at affiliated FM insurance, which you, I mean, those are cases where the affiliated has engineers. Parilla is not really about a doctor. And I'm just wondering if that, therefore, if there's some differentiation to be made as to common law negligence then. Well, I think the differentiation lies in, one, how it's been pled, and two, really the fact that Dr. McGee isn't necessarily a healthcare provider in this situation. He's more akin to an engineer in that he is interpreting drug test results. He had no hands-on interaction with my client. He did have interaction over the telephone, but he didn't have hands-on such as a surgeon would have with a patient, or an orthopedist, or some sort of practitioner in a clinical setting would have a hands-on approach. And therein, that's where 770 lies. But we didn't bring it under 770. We brought it under the common law. And so under the common law, it's a foreseeability test. Is it foreseeable that this violation of your duty would cause harm? And in this case, we have the testimony of Dr. McGee, as well as the testimony of our expert, an MRO, Paula Landsberger, who said, yes, it is foreseeable that when I'm interpreting these tests, I know that oftentimes the employer's employability and future employment lies with me and the interpretation as to whether or not they have a positive drug test or they have a negative drug test. And so for those reasons, we believe that it was properly submitted to the jury and that the jury did make a correct verdict in that Dr. McGee had a duty, he breached that duty, and that that duty caused damages to Mr. King. And so we would ask that, at least for Dr. McGee, that the jury verdict be upheld. With regards to OHS, they've raised— Frankly, on that particular question, we're really not here about whether we should uphold the jury verdict. We're here on deciding whether we should have granted summary judgment prior to getting to the jury, aren't we? Yes, we are, Your Honor. I agree. And I point to Judge Rice's opinion in that he found that there was a duty, and then, you know, I believe that that was also supported by the jury verdict. But I agree, we're not here looking at the jury verdict. With regards to OHS and agency, I think Your Honor's hit it right on the head here when we're talking about not the first or second prong, but whether there was detrimental reliance, this elusive third prong, if you will, of whether or not it applies or doesn't apply. And I would suggest that it does not apply. The restatement third has taken that out. And has Washington bound itself to the third restatement? Yes, it has, Your Honor. I believe that the jury instructions, as they were submitted to the Court, they do not contain that third prong of detrimental reliance.  That's a whole different question. That's a question of, you know, who prepared, of invited error, of waiver. It's a question of anything but Washington law. So what does Washington law tell us about reliance? I've read a number of cases in which Washington has required proof of reliance and cited the restatement second. What Washington cases indicate that Washington would change course and now follow the restatement third? I think that you need to look at the Ranger case and all the other cases that are cited in our brief. Well, I'll be fair. I've looked at those cases and I don't think any one of them says Washington adopts the restatement third. And frankly, Judge Bybee's question is dead on. That's why I didn't have to say anything about it to your client or to your opposition. I mean, if I look at what Washington cases say, reliance is right there. Only if the rethird, if the third comes along and changes all of that, it seems to me, do I get to second-guess Washington. But only if Washington adopts the restatement third. This is model law. It's not binding on Washington. Right, right. And I understand. I think really the bigger issue here is I think the facts as we're flushed out at trial show that my client, Mr. King, if we do go down the reliance path, did detrimentally rely on... Okay, so where's the detrimental reliance? Well, I think detrimental reliance is, we'll just assume that we've established agency and so we're on to the third prong. The detrimental reliance comes in in that my client relied upon Dr. McGee to correctly interpret this drug test. That's why you have a negligence claim here. That goes back to your first argument. That Dr. McGee is liable to your client because it was perfectly foreseeable. But what did your client do differently that he would not have done? How did he change his position to his detriment as a result of relying on Dr. McGee? He didn't believe him. I'm sorry, I've interrupted you twice now, but... Go ahead, Your Honor. All I was going to do is add to that. It seemed to me that all he did was he went and worked with Dee because Garfield told him to work with Dee. That was it. With Dr. McGee. Yeah. Yes. And so, therefore, OHS had no part of it. Well, I respectfully disagree, Your Honor. On reliance. Get back to Judge Bivey's question. I'm sorry I interrupted you in trying to respond to it because I'm just adding one more part to the whole. I didn't see any reliance here. Well, and I think the reliance comes in in that my client was relying on Dr. McGee and also on OHS by and through their communications. And so he... No, I can understand you're going to get through the first two prongs based on the communications. In fact, I've even got it down here. But reliance, you're not going to get through it on that. What communications says that he relied? That he relied on the actions of OHS to his detriment? Well, it was really his inaction, if you will, of not seeking a third opinion, not going to Dr. McGee directly and giving him the additional information. Everything went through the OHS pipeline. And so... Is there something that he gave to OHS that OHS didn't give to Dr. McGee? It's unknown to us because... Well, yeah, but you're now through a jury trial. So you had an opportunity to ask those questions. If you didn't ask the questions, it's a little late to be asking us to try and fix that. I agree, Your Honor. But we do believe that there is agency here, that we have met our burden to prove agency. The question is, did you meet the third prong? First two prongs, I agree with my colleague, Judge Smith, looks like you've satisfied. If Washington requires proof of reliance, I'm having a very difficult time seeing where you relied on what OHS did. Right. And I agree. Just for timing purposes, I'd like to move on, if I may, to... Of course. ...other issues. So we've also got an appeal against Garfield County, who was out on summary judgment, Garfield County Public Hospital District. And so really, Garfield County has responded to our motion and said, really, we were up on the Ninth Circuit years ago on qualified immunity, and they've brought a motion for summary judgment, which was granted by Judge Rice, finding that the law of the case doctrine applied. We believe that Judge Rice's decision in that was in error. And the reasons why we believe that are because it was a qualified immunity analysis. And as this court knows, a qualified immunity analysis is really a two-step process. One, was there a due process right that was violated or a constitutional right violated? And two, was that right clearly established? As... ...that Garfield had provided your client with notice of the presence of drugs in his sample, that it could result in termination, notice of that as well, that your client had the opportunity to explain the drug test to the three hospital administrators and a medical review officer, that your client had an opportunity to submit additional information, that was sufficient due process. Therefore, no constitutional violation, not a matter of no notice, no constitutional violation, and therefore, immunity. And therefore, the hospital, at least as to those particular claims, there's no way to get to the hospital because all our employees are immune. Right. I read the decision a little differently. And I read the decision as, you know, you can address qualified immunity on prong one or on prong two. And they addressed it on prong one. Why would they say this? Well, as I read that, and I think you're referring to after where they say there is no clearly established right, then they go through and say here are the arguments counsel presented on as to whether or not there was due process and whether it was violated. I take that as dicta. That's not...it's not a cornerstone of the case and we'll strike that. It's not a cornerstone of the opinion. The opinion is based upon that there was no clearly established right and therefore, qualified immunity applied. So I think that the court can reach the ultimate decision that qualified immunity does apply without getting to the first prong of whether or not the due process right was actually violated. And the court, especially when you look at the dissent in that case, and you look at Judge Rice's opinion, which was initially appealed, there is a difference of opinion as to whether or not... So if we agreed with you that we hadn't clearly decided that there was no violation, why don't you explain to me why you think there was a violation? Well, I think the violation comes in in that we know that a public employee has a liberty interest in his continued employment and when you publicly publish stigmatizing information, then your liberty interest in, i.e., a name-clearing hearing kicks in. And in this case, there was a February 22nd meeting with the hospital administration and the MRO, but there was no decision yet that had been made as to whether or not he would be terminated. And more importantly, my client was not given the actual levels of the urine sample. And that's important because the levels dictate how much you've ingested, how much time has passed, whether they're abusive levels, whether they're therapeutic levels pursuant to his prescription. And so the case law says you need to have a meaningful notice and opportunity to be heard. Well, I would suggest it cannot be a meaningful opportunity to be heard if you're fighting in the dark as to what you're arguing against. He didn't have the levels. He didn't have any of the evidence that the hospital was relying upon. And so it's really disingenuous to say that's a meaningful opportunity to be heard when he doesn't have a real opportunity to respond to anything that's going on because he doesn't have the quantitative levels and that's really the crux of this. Once we got the quantitative levels, our experts, our toxicologists, everyone says, oh yeah, those are therapeutic levels. Those are in accordance with your prescription. Dr. McGee himself even said in hindsight, looking at this, those are therapeutic levels. So once he had that key piece of information, then it becomes a meaningful opportunity. But without that, I would suggest it's not a meaningful opportunity. And that was the only opportunity that he had. And do you only, do you just have to show a violation of due process to show this? Do you have to show a pattern? Do you have to show a policy? Well, that goes into whether or not Mr. Craig is a policymaker and so on and so forth. I think that, and the case law supports this, that you can have a single isolated incident. You can have a very single isolated incident. Judge Antune, I know you had a case recently, Campbell versus County of Volusia, where you had a police officer handcuffing incident. And that was a single isolated incident that can rise to the level of lack of training, a deliberate indifference. I think that's what we have here. Well, you don't have a lack of training, surely. Well, we have the hospital CEO, HR, who don't know what a liberty interest is when they're dealing with public employees, don't know what a name clearing hearing is. The Garfield handbook does not identify by name or otherwise any name clearing, pre-termination hearing at all. And so, I do think that there is a complete lack of training on behalf of the hospital and its staff with regards to this issue. And you're suggesting that the lack of training you allege is sufficient without any pattern of behavior to suggest that that's deliberate indifference? Yes, I am, Your Honor, because this... What's the best case? Well, I think the best case is really the... I mean, when I say, I looked at your situation and I said to myself, they're saying that there's failure. They got one behavior as all is pled. And in general, if I'm going to find deliberate indifference, it's got to be a behavior, a pattern of behavior. And you're suggesting one problem that you're alleging is wrong, no prior behavior equals deliberate indifference. Yes, I am. Under the single incident theory where it is so patently obvious in this case. And what is your best case? That's why I said. I would cite the court to Tau versus Desert Palace. Tau is the best? I believe so, Your Honor. All right. Thank you. That answers my question. I see that I'm out of time. I will afford you time for rebuttal. Thank you very much, Your Honors. Good morning, Your Honors. I'm Susan Trotman. I represent Garfield County Public Hospital District, the respondent and the cross appeal brought by Mr. King. The question under the law of the case doctrine is whether a prior panel of this court addressed the first prong of the qualified immunity test. Did it decide, as Judge Smith suggests, that Mr. King received a constitutionally sufficient hearing in relation to the drug test and his termination? I began where Judge Smith began with the factual description that's provided by the panel, and then point to the last sentence in that paragraph. It's the first paragraph on page three of the memorandum. The last sentence reads, various arguments that plaintiff was not provided sufficient process are not persuasive. That's a double negative. It means that Mr. King was provided sufficient process, because there can be no municipal liability under section 1983 unless there's a constitutional violation. That should be the end of it. Mr. King tries to escape the obvious import of that sentence by arguing that it's dicta. It's not dicta. The prior panel addressed both prongs of the qualified immunity analysis. The opinion was joined by a majority. Mr. King can't escape the conclusions reached by the majority, simply because the panel could have decided the qualified immunity question on the second prong. It could have, but it didn't. It chose to address both prongs. And when a decision addresses or provides two grounds for its holding, neither ground is dicta. So I think that third, that sentence in that. But the whole question really is, is it dicta or is it not? Because if it isn't, you win. If it is, then what? If it is dicta, I would still argue that the memorandum in total addresses the second prong, because it's not just that one sentence. But if you're saying the whole first prong conclusion is dicta, then the second argument that the hospital presents is there's still no municipal liability because there is no municipal policy. You can assume that there's a constitutional violation. The hospital still is entitled to summary judgment because there's no evidence of a municipal policy. The two arguments made by Mr. King in that regard are, number one, Mr. Craigie was a policymaker. He clearly wasn't. You start with the state law. JUSTICE SCALIA. Right. It doesn't seem to me that Mr. Craigie is responsible, given that the power leads with the Board of Commissioners. But then he's, what about the Board itself? CHIEF JUSTICE ROBERTS. That's an interesting point. Nowhere in the district court argument was it suggested by Mr. King that the Board had any – they didn't raise the ratification theory. They didn't argue that the Board knew about, approved, or ratified the termination of Mr. King. So, number one, that argument is not properly before this Court. But to answer your question, there's no evidence. In fact, the evidence is to the contrary. The Board didn't know about Mr. King's termination in advance. It did not approve the termination. It couldn't have ratified the termination. So the Board is the policymaker, but they're completely divorced from this whole scenario. JUSTICE ROBERTS. Well, Mr. Galloway proceeds then to talk about training. How do you answer his argument? CHIEF JUSTICE ROBERTS. The argument, more generally, is that there was a policy of an inaction or omission, and the two omissions pointed to are the lack of training and the lack of a written policy. With respect to training, the only thing Mr. King points to is the testimony of the three individual administrators, who all said they didn't know what a name-clearing hearing was. That personal ignorance of a legal term does not show institutional deliberate indifference. It doesn't go to the question of training at all. It just shows that these three individuals did not know the meaning of that particular term. In fact, the facts show that the hospital did provide an opportunity to be heard. Its employees understood that employees have a right to be heard, and the grievance policy that's set out in the employee handbook specifically says that an employee has a right to appeal unsatisfactory. CEO decision to the board, that didn't happen in this case. So I think I'm getting off from your training question, but... CHIEF JUSTICE ROBERTS Well, you addressed a question he did not address, so I'm getting to the training. CHIEF JUSTICE ROBERTS Okay. CHIEF JUSTICE ROBERTS He says, the failure to train in this instance is deliberate indifference, and he needs no pattern of behavior, and the TAO is the best case for him.  What the deliberate indifference standard really means, it's a very strict standard, and ordinarily, yes, there has to be some sort of pattern so that the employer is on notice of the potential of constitutional violations. And in this case, there's absolutely no evidence of a pattern or even a single prior due process violation. Does TAO get us past that? CHIEF JUSTICE ROBERTS  CHIEF JUSTICE ROBERTS Why? CHIEF JUSTICE ROBERTS Because the case says that the employee or the plaintiff must show that the employer was on actual or constructive notice of the potential for constitutional violations. It's not simply, well, the easiest way to do that is to show it's happened before. Therefore, you should have known and you should have fixed it. That's not present in this case. So the question is, is there some sort of constructive notice that arises that the hospital should have known that this might happen? And the answer to that is no, because the situation involving Mr. King was extremely unique. There's no way the hospital could have known and anticipated and prevented a certified MRO from negligently certifying a drug test result. That's the problem with this hearing, according to Mr. King. And I mean, there's just, it's not like, for example, an excessive force case where that might be something that the police department would anticipate. We couldn't anticipate this situation. CHIEF JUSTICE ROBERTS Well, there's no record, there's no notice, excuse me, there's no evidence in the record that you could have anticipated it. Is that it? CHIEF JUSTICE ROBERTS There's no evidence in the record. And just, I guess, as a matter of common sense, there's no way to anticipate someone else's negligence and prevent it. CHIEF JUSTICE ROBERTS  CHIEF JUSTICE ROBERTS In conclusion, this Court should affirm the district court's decision granting summary judgment to my client for two reasons. The first is the law of the case doctrine, and the second is the absence of a municipal policy. CHIEF JUSTICE ROBERTS  CHIEF JUSTICE ROBERTS Galloway? MR. GALLOWAY I'll be brief. I know I ran over and time is of the essence. Just quickly, I think we're really back here to, was there a constitutional violation? And here there clearly was, because you can't have a meaningful notice and opportunity to be heard if you don't have the quantitative levels, which as soon as we got those quantitative levels, it was shown the negligence, which would have undone, if you will, all of this. CHIEF JUSTICE ROBERTS Did your client ever ask for a second hearing? MR. GALLOWAY Yes, he asked for a hearing. Actually, he asked Mr. Craigie for a hearing before the Board of Commissioners, which was denied. CHIEF JUSTICE ROBERTS So he did ask for, he did attempt to follow the policy. MR. GALLOWAY What would he have done at that second hearing? CHIEF JUSTICE ROBERTS Well, at that point, he had been terminated, and so he had the quantitative levels. And so what he would have done is he would have had the quantitative levels and he would have hired his own MRO to come in, as he did at the unemployment hearing later, to explain the levels and that they were therapeutic. MR. GALLOWAY I know that I'm out of time. I thank you for your time this morning. CHIEF JUSTICE ROBERTS Good. Thank you, Mr. Galloway. I thank all counsel for the argument. The case is submitted.
judges: Bybee, N.R. Smith, Antoon